NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| CHRISTOPHER OJI, : | |
| : | **Civil Action No. 11-7206 (SRC)** |
| Plaintiff, : | |
| : | **OPINION** |
| v. : | |
| : | |
| GANNETT FLEMING, INC., GEORGE : | |
| CAMPANELLA, DOES 1-10, : | |
| : | |
| Defendants. : | |

**CHESLER**, District Judge

This matter comes before the Court upon the motion for summary judgment filed by Defendants Gannett Fleming, Inc. and George Campanella. Plaintiff Christopher Oji opposes the motion. The Court has considered the papers submitted by the parties and proceeds to rule without oral argument pursuant to Federal Rule of Civil Procedure 78. For the reasons that follow, the Court will grant in part and deny in part Defendants' motion.

**I.    BACKGROUND**

**A.  Facts**

In this case, an African American employee contends that he experienced racial discrimination at work and that his employers unlawfully fired him once he complained of that discrimination. Plaintiff Christopher Oji is a Nigerian-American male who worked as an engineer at Defendant Company Gannett Fleming from March 2008 until February 2010.

Plaintiff claims that when he began to work at Gannett Fleming, he noticed that he did not receive business cards, a laptop, or requisite training, which he believed non-minority engineers were receiving. He soon began to hear some co-workers make racially based remarks

in his presence. Plaintiff heard one co-worker say that an Asian employee had "a small penis." (Docket Entry 83, Document 1, at 204). He contends that another employee, Mr. Popen, "used the N word" while describing African Americans, and that another, Mr. Davis, called Plaintiff a drug-dealer and mimicked Plaintiff's speech. (Docket Entry 83, Document 4, at 3-4). In May of 2009, Plaintiff heard a Mr. Fantozzi say that "his children will never bring black people home," and someone else refer to "African people as thieves and pirates." (Id. at 4).

Plaintiff identifies other problems at work as well. He claims that his supervisor, Defendant Campanella, asked him to charge time for projects on which he had not yet worked. He also contends that his workspace was tampered with. Specifically, on October 26, 2009, Plaintiff told Campanella that someone took files from his office, and that they put sugar on his keyboard and a white substance on his chair. Campanella went to Plaintiff's workspace and found that Plaintiff's "mouse looked like it had a little bit of glue on it," and he noted a "small discoloration spot on his chair." (Docket Entry 77, Document 14, at 157:5-7). Campanella reported the incident, and a human resources specialist, William DeLone, interviewed Plaintiff. DeLone wrote that Plaintiff did not know what the motivation for the tampering was.

Plaintiff soon complained to police about what he viewed as harassment at Gannett Flemming, and the company's management learned that Plaintiff had done so.

Mr. DeLone investigated Plaintiff's allegation of tampering, but he concluded that the allegation could not be substantiated nor tied to Plaintiff's race. DeLone shifted his investigation to Plaintiff's own behavior, and he began to interview employees about problems they had experienced with Plaintiff. In late November of 2009, among Mr. DeLone's overall findings were: "(a) [P]hysical threats made by [Plaintiff] towards other employees"; "(b) observations made by numerous staff members regarding [Plaintiff's] hours, specifically how he comes to

2

work late, leaves early, and frequently takes exceptionally long lunch breaks"; and "(c) [Plaintiff's] practice of keeping his computer logged on when he is not present[.]" [Docket Entry 83, Document 26, at 497]. Management began to track Plaintiff's computer usage.

DeLone also documented Plaintiff's use of profanity, which was reported by Davis and Campanella. In a memorandum on November 25, 2009, Campanella wrote to Plaintiff: "[T]oday in the atrium, you were yelling into your cell phone 'I'm going to get these mother fuckers.' Your voice was so loud I could hear you on the third floor." (Docket Entry 77, Document 5, at 412). Campanella told Plaintiff that if he could not act professionally, his employment would be terminated.

Citing these various problems with Plaintiff's behaviors, Defendants placed Plaintiff on administrative leave on February 3, 2010, and they ultimately terminated him on February 12th. In the termination letter, Defendants wrote as follows:

> [Y]our persistent refusal to abide by our behavior standards is adversely impacting our ability to effectively run our business, which culminated in your current administrative leave status . . . . Rather than attempting to improve, you have debated virtually every task we assign you . . . and rebuffed our attempts to provide constructive feedback and mentoring.

[Docket Entry 77, Document 8].

On November 30, 2009, Plaintiff filed a Complaint with the United States Equal Employment Opportunity Commission ("EEOC"), which he later amended.

**B. Procedural History**

In October of 2011, Plaintiff filed suit against Defendants in New Jersey state court, and Defendants removed the action to federal court on December 12th, 2011. In February of 2012, Defendant Campanella moved to dismiss certain of Plaintiff's claims, which the Court granted in part and denied in part. On July 28, 2012, Plaintiff filed an Amended Complaint. Pursuant to a

3

stipulation among the parties, in September of 2012 the Court dismissed those of Plaintiff's claims which arose under New Jersey's Conscientious Employee Protection Act ("CEPA").

Remaining in Plaintiff's Amended Complaint are allegations of: racial discrimination in violation of Title VII; national-origin discrimination in violation of Title VII; retaliation in violation of Title VII; racial discrimination in violation of the New Jersey Law Against Discrimination ("NJLAD"); national-origin discrimination in violation of the NJLAD; hostile work environment in violation of the NJLAD; retaliation in violation of the NJLAD; and failure to pay overtime wages, in violation of the Fair Labor Standards Act ("FLSA") and state law.

After protracted and contested discovery, Defendants moved for summary judgment on September 26, 2014. In their moving papers, Defendants urge that Plaintiff has failed to offer any evidence to substantiate his claims of discrimination or retaliation. They also note that they have articulated a legitimate and non-discriminatory justification for terminating Plaintiff, namely, his insubordination and repeated violations of company policies. Finally, they note that as a professional engineer, Plaintiff is not entitled to overtime pay.

In November of 2014, Plaintiff submitted his opposition to Defendants' motion. In essence, he argues that there exist genuine issues of fact as to the reasons that Defendants fired him. Plaintiff contends that Defendants' cited justifications are merely pretextual, and that they unlawfully terminated him for discriminatory and retaliatory reasons.

## II.  DISCUSSION

### A. Legal Standard

Federal Rule of Civil Procedure 56(a) provides that a "court shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp.

v. Catrett, 477 U.S. 317, 322-23 (1986) (construing the similarly worded Rule 56(c), predecessor to the current summary judgment standard set forth in Rule 56(a)).  A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In considering a motion for summary judgment, a district court "must view the evidence 'in the light most favorable to the opposing party.'"  Tolan v. Cotton, 134 S. Ct. 1861, 1866 (2014) (quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970)).  The court may not make credibility determinations or engage in any weighing of the evidence.  Anderson, 477 U.S. at 255.

The showing required to establish that there is no genuine issue of material fact depends on whether the moving party bears the burden of proof at trial.  On claims for which the moving party does not bear the burden of proof at trial, the movant must point out to the district court "that there is an absence of evidence to support the nonmoving party's case."  Celotex, 477 U.S. at 325.  In contrast, "[w]hen the moving party has the burden of proof at trial, that party must show affirmatively the absence of a genuine issue of material fact: it must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party."  In re Bressman, 327 F.3d 229, 238 (3d Cir. 2003) (quoting United States v. Four Parcels of Real Property, 941 F.2d 1428, 1438 (11th Cir. 1991)).

Once the moving party has satisfied its initial burden, the party opposing the motion must establish the existence of a genuine issue as to a material fact.  Jersey Cent. Power & Light Co. v. Lacey Twp., 772 F.2d 1103, 1109 (3d Cir. 1985).  "A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."  Gleason v. Norwest Mortg., Inc., 243 F.3d 130, 138 (3d Cir. 2001), overruled on other

grounds by Ray Haluch Gravel Co. v. Cent. Pension Fund of the Int'l Union of Operating Eng'rs and Participating Emp'rs, 134 S. Ct. 773 (2014).  However, the party opposing the motion for summary judgment cannot rest on mere allegations; instead, it must present actual evidence that creates a genuine issue as to a material fact for trial.  Anderson, 477 U.S. at 248; see also Schoch v. First Fid. Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990) (holding that "unsupported allegations in [a] memorandum and pleadings are insufficient to repel summary judgment").

**B.  Retaliation**

Plaintiff contends that Defendants unlawfully retaliated against him in violation of Title VII and the NJLAD.  "Retaliation claims under Title VII and the NJ LAD require the plaintiff to satisfy the same elements."  Joseph v. New Jersey Transit Rail Operations, 586 F. App'x 890, 893 (3d Cir. 2014).  To make out a prima facie case of retaliation,

> an employee must show by a preponderance of the evidence that (1) he or she engaged in protected activity known to the employer; (2) he or she thereafter was subjected to an adverse employment decision by the employers; and (3) there was a [causal] link between the protected activity and adverse employment decision.
>
> [Joseph v. New Jersey Transit Rail Operations, 586 F. App'x 890, 893 (3d Cir. 2014) (internal citation and quotation marks omitted); see also Battaglia v. United Parcel Serv., 214 N.J. 518, 547 (2013)].

Whether a causal link exists often turns on "timing and evidence of ongoing antagonism." Joseph, 586 F. App'x at 893 (citing Abramson v. William Paterson Coll. of N.J., 260 F.3d 265, 288 (3d Cir.2001)).  A plaintiff who makes out a prima facie case of retaliation will "withstand summary judgment."  See Abramson, 260 F.3d at 289.

Here, Plaintiff satisfies the first two elements.  First, the record demonstrates that he "engaged in protected activity known to [his] employer" because he complained about racial harassment and discrimination, which Defendants learned.  Second, he was "subjected to an

6

adverse employment decision" when Defendants placed him on administrative leave and then terminated his employment altogether.

Whether Plaintiff has made out a prima facie case thus turns on whether a "causal link" exists between Plaintiff's complaints of racial discrimination and the actions taken against him. At this stage, the Court finds the record to contain sufficient evidence from which a jury could reasonably find such a causal link. Defendants are thus not entitled to summary judgment.

In late October 2009, Plaintiff complained to his supervisor that his workspace had been tampered with, and although Plaintiff stated that he did not know the motivation behind such an act, he acknowledged to his employers that it "could be race." (Docket Entry 77, Document 4, Page 408). Ultimately dissatisfied with the company's response to the tampering, Plaintiff complained about racial harassment directly to law enforcement. The manager of Plaintiff's department, Mr. Kowalski, testified in his deposition that he was aware that Plaintiff had complained to the police. Plaintiff also asserts, and Defendants admit, that Mr. Delone knew Plaintiff had contacted the police about "race discrimination." (Docket Entry 84 at ¶ 53; Docket Entry 88, Document 8, at ¶ 53). Delone further affirmed in his deposition that he knew Plaintiff had complained "about racial discrimination." (Docket Entry 83, at 50:6-10). Plaintiff also asserts that he told the company about his later complaint to the EEOC.

Close timing between protected activity and an adverse employment decision may suggest that such a decision was retaliatory. See Joseph, 586 F. App'x at 893; Farrell v. Planters Lifesavers Co., 206 F.3d 271, 285 (3d Cir. 2000); see also Marra v. Philadelphia Hous. Auth., 497 F.3d 286, 302 (3d Cir. 2007) (applying Pennsylvania law to find that under "narrow circumstances, an unusually suggestive proximity in time between the protected activity and the adverse action may be sufficient, on its own, to establish the requisite causal connection)

7

(internal citation and quotation marks omitted).  The record here suggests that mere days passed after Plaintiff complained of harassment and before Defendants began to investigate Plaintiff's workplace conduct.  More pertinently, Defendants terminated Plaintiff's employment a few months after they learned that he had alleged racial discrimination, and only a couple of months after he filed an EEOC complaint to the same effect.  Under the circumstances, this close temporal connection is strongly suggestive of the requisite "causal link."

Apart from timing alone, it is also notable that Defendants responded to Plaintiff's complaints of harassment primarily by investigating Plaintiff himself.  This happened despite the fact that the person investigating Plaintiff, Mr. Delone, had not received any complaints about Plaintiff's alleged threats or internet usage before October of 2009.  A jury could reasonably view Defendants' investigation as a response to Plaintiff's allegations, or more precisely, as an effort to compile a list of his shortcomings which could later serve as the pretextual basis for firing.  Plaintiff also notes bitter interpersonal exchanges between him and management that further resemble the kind of "antagonism" indicative of retaliation.  Joseph, 586 F. App'x at 893.

That Defendants' conduct may reasonably appear to be retaliatory is further indicated by Defendants' own communications.  Namely, Mr. DeLone emailed Defendant Campanella to say that under the circumstances, "we are all aware that [Plaintiff] may file a retaliation claim . . . we want to make sure we don't inadvertently create a perspective whereby he can claim that we are applying a higher standard for him vs. others." [Docket Entry 83, Document 2, at 1].  Such apprehension about the appearance of Defendants' conduct was not ill-founded.  All told, in light of the above considerations, the Court concludes that Plaintiff has made out a prima facie case of retaliation, and the Court will therefore deny summary judgment to Defendants.

### C. Employment Discrimination

The Court will next assess Plaintiff's claims of unlawful racial and national-origin discrimination under Title VII, the NJLAD, and 42 U.S.C. 1981, all of which are governed by the same standard. See Brown v. J. Kaz, Inc., 581 F.3d 175, 181-82 (3d Cir. 2009) ("[T]he substantive elements of a claim under section 1981 are generally identical to the elements of an employment discrimination claim under Title VII."); Davis v. City of Newark, 285 F. App'x 899, 903 (3d Cir. 2008) ("Discrimination claims brought under Title VII and NJLAD must be analyzed according to the burden-shifting framework set forth by the Supreme Court in McDonnell[.]"). To assess claims of employment discrimination, the Court applies a familiar burden-shifting framework set forth initially in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and later modified. That framework has three steps:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection. Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.
>
> [Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981) (internal citations and quotation marks omitted)].

To demonstrate a prima facie case, Plaintiff must show that he was (1) a member of a protected class; (2) qualified; and (3) subject to adverse employment action (4) under circumstances giving rise to an inference of discrimination. Sarullo v. U.S. Postal Serv., 352 F.3d 789, 797 (3d Cir. 2003). This initial burden is not onerous. See Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ., 470 F.3d 535, 539 (3d Cir. 2006) ("[T]here is a low bar

9

for establishing a prima facie case of employment discrimination . . . . the prima facie case is easily made out[.]") (internal citations and quotation marks omitted).

If an employer articulates a nondiscriminatory justification, the plaintiff may rebut it as pretextual "by submitting evidence from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Keller v. Orix Credit Alliance, 130 F.3d 1101, 1108 (3d Cir. 1997) (internal citation and quotation marks omitted).

Here, Plaintiff satisfies the first three elements needed to establish a prima facie case of discrimination. He appears to have been qualified for the position, as reflected in an initial performance review included in the record; he is a member of a protected racial and ethnic class; and he suffered an adverse employment decision in the form of his firing.

Turning to the fourth element, Plaintiff has also surmounted this non-onerous burden, as he has identified circumstances that are reasonably suggestive of discrimination. Plaintiff alleges that he was the only black engineer at his office, and that his employers treated him as inferior to his white co-workers, both in terms of the training afforded to them and the perks received, including business cards and laptops. He also alleges that Defendants failed to adequately respond to Plaintiff's complaints of racial harassment and racial remarks by other employees. To be sure, Defendants counter that all of these allegations are false or misleading, and a jury could eventually side with Defendants on these issues. Yet at this stage, Plaintiff has demonstrated enough to overcome what amounts to a very "low bar." Rock Univ., 470 F.3d at 539.

Defendants articulate a non-discriminatory justification for Plaintiff's firing, that is, his alleged unprofessionalism and insubordination. They emphasize the ample portions of the

record in which they document significant problems with Plaintiff's behavior.  However, a genuine issue of material fact exists as to whether Defendants' investigation was tainted by retaliatory motives, as discussed in the last section.  If a jury were to find that the investigation of Plaintiff was in response to Plaintiff's complaints of discrimination, it could disbelieve that the problems unearthed by that investigation were actually the cause of Plaintiff's firing.

For these reasons, Plaintiff has rebutted Defendants' proffered explanation, and summary judgment may therefore not be granted in Defendants' favor.  Because Plaintiff's allegations implicate a right to contractual employment free from racial discrimination, Plaintiff's 42 U.S.C. 1981 claim may proceed along with his claims under Title VII and the NJLAD.

### D.  Hostile Work Environment

Plaintiff additionally alleges that Defendants are liable under the NJLAD for having created a hostile work environment.  "New Jersey courts treat hostile work environment claims under the NJLAD the same as the Supreme Court treats hostile work environment actions under Title VII." Sgro v. Bloomberg L.P., 331 F. App'x 932, 941 (3d Cir. 2009).

To establish a claim for a hostile work environment, a plaintiff must show:  "(1) that he or she suffered intentional discrimination because of race; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same race in that position; and (5) the existence of respondeat superior liability." Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1081 (3d Cir. 1996) (internal citations and quotation marks omitted); Weston v. Pennsylvania, 251 F.3d 420, 426 (3d Cir. 2001) (applying same five factors to assess claim of sexually hostile work environment).  New Jersey Courts have also formulated the test by holding that a plaintiff must prove that the defendants' "conduct (1) would not have occurred but for the employee's

11

[race]; and [the conduct] was (2) severe or pervasive enough to make a (3) reasonable [African American] believe that (4) the conditions of employment are altered and the working environment is hostile or abusive." Taylor v. Metzger, 152 N.J. 490, 498 (1998).

To assess whether a work environment is hostile, courts assess factors which include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Sys., 510 U.S. 17, 23 (1993).

Here, Plaintiff's claim of a hostile work environment rests primarily on racist comments made in his presence. He heard other employees make various offensive remarks: one said that an Asian individual had "a small penis"; another "used the N word" to describe African Americans in Philadelphia; Mr. Fantozzi said "his children will never bring black people home"; and another referred to "African people as thieves and pirates." Plaintiff also alleges that one co-worker, William Davis, called Plaintiff a drug-dealer, and that he also mimicked Plaintiff's accented speech. (See Docket Entry 83, Document 1, at 204; Document 4, at 3-4).

These alleged comments -- while reprehensible, and indeed sufficient to help make out a prima facie case of discrimination -- fall short of the kind of frequent, severe, and humiliating comments that can establish a hostile workplace. Harris, 510 U.S. at 23. Many of the alleged remarks were not directed at Plaintiff, but were overheard about others. Moreover, those directed at Plaintiff, though highly problematic, were not "severe or pervasive enough" such that "the conditions of employment [were] altered[.]" Taylor, 152 N.J. at 498.

It is helpful to examine the kinds of pervasive behaviors that do rise to the level of a hostile workplace environment. The case of Hurley v. Atl. City Police Dep't, 933 F. Supp. 396, 407 (D.N.J. 1996), aff'd, 174 F.3d 95 (3d Cir. 1999), is illustrative. There, a female police

officer complained of widespread sexual mistreatment in the police department where she worked.  Plaintiff's co-workers repeatedly harassed her, with one stating that they heard she liked men "hard and stiff," and asking her if she wanted to drink coffee out of a jock cup.  Id. at 406.  Another referred to plaintiff as being "under the captain's desk."  Id.  The plaintiff also found "sexually explicit and demeaning drawings of" herself on various walls in the office, which were not removed despite her complaints.  Id. at 405.  In fact, when plaintiff did complain of misconduct, her supervisor said she was "too emotional."  Id.  Instead of putting a stop to the conduct, plaintiff's employers encouraged, condoned, and participated in it.  Her supervising captain told her that she had been assigned to him to "break [his] balls."  Id. at 405.  The Chief of Police told plaintiff that if she were in the private sector, rather than in the police force, she could be protected from sexual harassment by sleeping with her bosses.  He also solicited sex from plaintiff by informing her that he had lost weight by "having sex a few times a day" with women who came to him "when they're ready."  Id. at 406.  Plaintiff eventually took an extended sick leave, asserting that she was suffering from severe emotional distress as a result of harassment.

In this case, Plaintiff's allegations are distinct from those in Hurley, and they much more closely resemble those in Henson v. U.S. Foodservice, 588 F. App'x 121, 127 (3d Cir. 2014).  In that case, the Third Circuit affirmed summary judgment for an employer after an employee heard numerous racially offensive comments at work.  Specifically, in Henson, an African-American plaintiff alleged that a co-worker asked him and other African-American employees "if they were eating chicken and grape soda, joked about African–Americans' genital sizes and watching basketball," and called the plaintiff's lunch break "the BET [Black Entertainment Television] lunch."  Id. at 124.  Although the Court did "not condone [the co-worker's] offensive remarks in any way," it held that they "alone were insufficient to create a hostile work environment."  Id. at

13

127. There, as is the case here, the plaintiff had "not shown that these comments were so severe and pervasive that a reasonable person in his position would believe that the conditions of his employment were altered." Id.

Much of the conduct to which Plaintiff points, including the instance of alleged tampering, is not demonstrably connected to Plaintiff's minority status. Those co-workers' comments which were based on race appear to have been sporadic and indirect, rather than "pervasive and regular" enough to outright alter the working conditions at Gannett Flemming. For this reason, the Court will grant summary judgment in favor of Defendants on Plaintiff's hostile work environment claim.

**E. Overtime Pay**

Finally, Plaintiff includes in his complaint an allegation that Defendants failed to provide him overtime pay in accordance with the Fair Labor Standards Act ("FLSA") and state law. The FLSA "exempts 'bona fide executive, administrative, or professional' employees from overtime pay requirements." Auer v. Robbins, 519 U.S. 452, 454 (1997) (citing 29 U.S.C. §§ 201 et seq.). The Secretary of Labor has promulgated regulations defining a professional employee as one who is paid on a salary basis of a certain amount, and whose work requires "knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction[.]" 29 C.F.R. § 541.300(a). New Jersey regulations similarly exempt professionals from overtime requirements. See N.J. Admin. Code § 12:56-7.1.

Here, Defendants assert that Plaintiff qualifies as a professional employee under the applicable standards, and he is thus exempt from the overtime pay provisions. They also note that in Balgowan v. State of N.J., 115 F.3d 214, 219 (3d Cir. 1997), the Third Circuit found that engineers who work for New Jersey's Department of Transportation "qualify for the professional

exemption" under the FLSA. Defendants note that Plaintiff is a graduate of an accredited school with an engineering degree.

Plaintiff does not appear to counter these contentions. Instead, Plaintiff asserts that he was not paid overtime even though white employees were. The Court may and has considered Plaintiff's allegations of disparate treatment with respect to his other claims. Yet with particular reference to Plaintiff's overtime claim, it appears that Plaintiff is a professional employee, and that he has not put forward a reason for which he should not be considered exempt as such. The Court will accordingly grant summary judgment to Defendants on this allegation.

### III.   CONCLUSION

For the reasons above, the Court finds that Defendants are entitled to summary judgment on Plaintiff's claims of a hostile work environment and overtime pay; they are not entitled to summary judgment on Plaintiff's other claims. An appropriate Order will be filed.

       s/ Stanley R. Chesler
    STANLEY R. CHESLER
   United States District Judge

Dated: March 13, 2015